UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KATINA D. HULL,                     :
                                    :CIVIL ACTION NO. 3:18-CV-0006
          Plaintiff,                :
                                    :(JUDGE CONABOY)
          v.                        :
                                    :
NANCY A. BERRYHILL,                 :
Acting Commissioner of              :
Social Security,                    :
                                    :
          Defendant.                :
                                    :
_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. (Doc. 1.) Plaintiff protectively filed applications on March 4, 2014, alleging disability beginning on November 24, 2012. (R. 15.) After Plaintiff appealed the initial May 16, 2014, denial of the claims, hearings were held by Administrative Law Judge ("ALJ") Theodore Burock on February 12, 2016, and August 19, 2016. (R. 38-71.) ALJ Burock issued his Decision on March 29, 2017, concluding that Plaintiff had not been under a disability, as defined in the Social Security Act ("Act") from November 24, 2012, through the date of the Decision. (R. 26.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on December 15, 2017. (R. 1-6.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on January 2, 2018. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in finding Plaintiff's mental health conditions do not meet Section 12.04 of the Listings; 2) the ALJ erred in failing to accord proper weight to Plaintiff's treating mental health providers in reaching a residual functional capacity ("RFC") assessment; and 3) the ALJ's RFC findings are not supported by substantial evidence. (Doc. 11 at 27-39.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly granted.

## I. Background

Plaintiff was born on June 20, 1973, and was thirty-nine years old on the alleged disability onset date. (R. 25.) She has a high school education and past relevant work as a nurse assistant and bank clerk. (*Id.*) The March 19, 2014, Disability Report indicates Plaintiff alleged that her ability to work was limited by bipolar disorder, anxiety, back issues, arthritis, and generalized pain. (R. 259.)

### A. *Medical Evidence*

Given the extensive record in this case and the limited scope of the issues raised in Plaintiff's appeal of the Acting Commissioner's decision, the Court will provide a brief summary of medical evidence to provide context for discussion. Specific

evidence relevant to claimed errors will be considered in the context of the arguments raised.

From February 2016 through January 2015, Plaintiff received primary care at Ketytone Family Practice. (Doc. 11 at 6.) During that time she was treated for various conditions including lumbar and cervical spine pain with radiculopathy, high blood pressure, anxiety, depression, bilateral knee pain, foot pain, dizziness, and diabetes. (Doc. 11 at 6.) She received primary care at Summit Primary care from July 2015 through March 2016. (R. 1523-41.)

Plaintiff treated at Summit Pain Medicine from July 18, 2012, through July 27, 2016, initially reporting to Amanpreet Sandhu, M.D., that she had injured her back in 2010. (Doc. 11 at 11.) She was first treated for chronic low back pain and was referred for physical therapy. (R. 385.) Physical therapy initially helped but was discontinued because of aggravated symptoms including increased lumbosacral pain which worsened with prolonged standing, walking, and sitting. (Doc. 11 at 12.) By May 2013, Plaintiff reported good pain relief with repeated L5-S1 epidural injections but she began to complain of constant neck pain that radiated to her shoulders and intermittent headaches after exacerbation of neck pain. (Doc. 11 at 13.) Plaintiff had cervical epidural steroid injections in June 2013, and in July Plaintiff reported good neck pain relief but increased lower back symptoms. (*Id.*) Following August and September 2013 intra-articular facet joint injections at

L4-5 and L5-S1, Plaintiff reported that her low back pain was well controlled but she still had intermittent muscle spasms. (*Id.* at 14.) In December 2012, Plaintiff resumed regular activities without significant exacerbation of her symptoms and was told to return to the pain clinic as needed. (*Id.*) By August 2014, Plaintiff's bilateral L5 radiculopathy had returned and she again received injections which helped the low back pain. (*Id.*)

In December 2014, Plaintiff reported increasing neck and lower back pain with some spasms. (*Id.*) Plaintiff continued to receive injections periodically with varying pain symptoms reported through 2015. (*Id.* at 15.) In early 2016, Plaintiff reported a flare of lower back pain secondary to prolonged sitting after driving to Harrisburg for a disability hearing. (*Id.*) With reports in March 2016 of progressive worsening of low back symptoms, radicular pain, and increased neck pain, Plaintiff was scheduled for lumbar facet and caudal injections. (Doc. 11 at 15.) At Plaintiff's five visits to Summit Pain Medicine from April 19, 2016, through July 27, 2016, she reported improvement as well as ongoing significant functional limitations. (*Id.* at 16.)

Plaintiff received mental health treatment at Keystone Behavioral Health ("KBH") after being referred by her primary care provider in April 2012 due to anxiety. (Doc. 11 at 16.) Plaintiff first saw psychiatrist Iraki Mania, M.D., and later was seen from June 2014 through June 2016 by psychiatrist Kawish Garg, M.D..

(*Id.* at 16-17.) She also saw licensed counselor Robin Witmer once or twice a month beginning in April 2014. (*Id.* at 17-18.) Plaintiff states she was seen at KBH over 105 times since her alleged onset date. (*Id.* at 18.) Psychiatrists diagnosed biploar disorder and generalized anxiety order. (*Id.*) Records show waxing and waning symptoms and varied presentations during the relevant time. (*Id.*)

**B.  *Opinion Evidence***

**1.  <u>Physical Impairment Opinion</u>**

Angelique High, an examining occupational therapist, performed a functional capacity evaluation in October 2012. (R. 1082-91.) The reason for testing was to determine Palntiff's abilities and limitations for social security disability. (R. 1082.) Ms. High noted that Plaintiff's movements and physiological responses were consistent with maximal effort. (*Id.*) She concluded generally that Plaintiff was in the sedentary physical demand level. (R. 1083.) Ms. High's specific findings included that Plaintiff was limited to occasional standing work, and she could occasionally do stairs, walk, and sit. (R. 1084-85.) The identified bases for the limitations included lower back pain and decreased lower extremity strength. (*Id.*)

**2.  <u>Mental Impairment Opinions</u>**

In September 2012, Dr. Mania completed a Mental Impairment Questionnaire. (R. 793-98.) He identified bipolar disorder and

generalized anxiety order as Plaintiff's diagnoses and assessed a
GAF score of 65. (R. 793.) Based on monthly medication management
visits of fifteen minutes, he noted that Plaintiff had chronic mood
swings; she alternated from depression to irritability; she had
trouble sleeping; and she had constant anxiety and restlessness.
(*Id.*) Dr. Mania opined that Plaintiff's prognosis was "good with
treatment." (*Id.*) He found that Plaintiff would be unable to meet
competitive standards in the following areas: maintain attention
for a two-hour segment; maintain regular attendance and be punctual
within customary, usually strict tolerances; sustain an ordinary
routine without special supervision; work in coordination with or
proximity to others without interruptions from psychologically
based symptoms; perform at a consistent pace without an
unreasonable number and length of rest periods; understand and
remember detailed instructions; carry out detailed instructions;
deal with stress of semiskilled and skilled work; travel in
unfamiliar places; and use pubic transportation. (R. 795-96.) Dr.
Mania attributed some of these limitations to Plaintiff's severe
mood swings, constant anxiety, distractibility, and poor
concentration. (R. 796.) Dr. Mania opined that Plaintiff had at
most mild restriction in activities of daily living, marked
difficulties in maintaining social functioning, marked difficulties
in maintaining concentration, persistence or pace, and she had
experienced three episodes of decompensation within a twelve month

period, each of at least two weeks duration.  (R. 797.)  He indicated that Plaintiff had "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home."  (*Id.*)  He also opined that Plaintiff would miss work more than four days a month.  (*Id.*)

John Gavazzi, Psy.D., a State agency psychological consultant, completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity Assessment on April 22, 2014.  (R. 110-14.)  He concluded that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.  (R. 111.)  He also made the following findings: Plaintiff was moderately limited in her ability to understand and remember detailed instructions; she could understand, retain, and follow simple instructions, i.e., perform one and two step tasks and could perform simple, routine, repetitive tasks in a stable environment; she was moderately limited in her ability to carry out detailed instructions; she was moderately limited in her ability to interact appropriately with the general public; and she was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors.  (R. 112-13.)  In narrative form, Dr. Gavazzi explained that "[t]he claimant struggles with social skills.  The

7

claimant communicates clearly, relates appropriately to familiar others, and behaves predictably in most social situations. The claimant is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene." (R. 114.) Dr. Gavazzi further explained that "[t]he medical evidence establishes medically determinable impairments of Major Depressive Disorder and Generalized Anxiety Disorder. The claimant has not had any hospitalizations due to mental impairments. The claimant takes psychotropic agents. The claimant does not participate in psychotherapy." (*Id.*)

In December 2014, Dr. Garg completed a Mental Impairment Questionnaire identifying diagnoses of bipolar disorder and generalized anxiety. (R. 808.) He noted that Plaintiff was not doing well, she continued to experience unstable mood and emotional lability, she was depressed and unable to concentrate, and she was making very slow progress. (R. 808-09.) Dr. Garg assessed Plaintiff's prognosis to be "guarded/poor" and opined that she would miss work more than three days a month. (R. 809-10.) He further opined that she had marked or extreme limitations in all identified work aptitude categories. (R. 811.) Regarding functional limitations, he found Plaintiff had moderate restrictions in activities of daily living, extreme difficulties in maintaining social functioning, extreme difficulties with

8

concentration, persistence, or pace, and she had four or more episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from that situation or experience exacerbation of signs and symptoms. (R. 813.)

Plaintiff and Dr. Mania completed a Pennsylvania Department of Welfare Employability Assessment Form. (R. 1652-53.) In the first section, Plaintiff said she could not work because she had debilitating neck and back pain, she could not sit or stand for long, she had uncontrolled anxiety, she was very forgetful, bipolar disorder was unpredictable, she had bad arthritis, and she had a very weak wrist. (R. 1652.) In the second section of the form, Dr. Mania marked that Plaintiff was permanently disabled with the primary diagnosis of bipolar disorder and secondary diagnosis of generalized anxiety disorder. (R. 1653.)

## 3. **Third Party Function Report**

William Nieves, Plaintiff's boyfriend for more than eight years, completed a Third Party Function Report on April 4, 2014. (R. 268-75.) He explained that Plaintiff's ability to work was limited because depression caused sadness and random crying, back pain did not allow her to sit or stand for long periods, and anxiety caused her to "freak out around people she is not comfortable around." (R. 268.) Mr. Nieves indicated Plaintiff's conditions affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. (R. 273.) He also said

her memory and concentration were affected, as were her abilities to complete tasks, follow instructions, use her hands, and get along with others. (*Id.*) In narrative form, he said Plaintiff could not stand or sit for certain lengths of time, she had trouble remembering to do things, she had trouble concentrating and staying focused, and she was easily distracted. (*Id.*)

## C.  *Hearing Testimony*

At the February 12, 2016, hearing, Plaintiff's attorney summarized Plaintiff's impairments and stated that Plaintiff's mental health condition met Listing 12.04 for affective disorders and, alternatively, she would be limited to less than a full range of sedentary work based on the 2012 functional capacity assessment, the medical source statements of Drs. Mania and Garg, and the record as a whole. (R. 57-58.) The attorney posited that Plaintiff would need a sit-stand option, she would be incapable of working in coordination with others, her attention and concentration would be such that her productivity would be less than eighty percent of normal, and she would miss at least three days of work per month. (R. 58.)

Plaintiff testified that she had worked as a babysitter for her niece since her alleged onset date but she had stopped that in late 2015 because it got to be too much. (R. 60.) She said she was in pain all the time, mostly in her low back and in her neck. (*Id.*) She added that she got pain down her legs and her butt got

10

numb if she sat for too long.  (R. 61.)  Regarding pain management,
Plaintiff said she got injections which modified the pain but she
took pain pills continually.  (R. 62.)  Plaintiff also explained
that she had neuropathy which caused numbness and tingling in her
fingertips and toes.  (R. 64.)  When asked about physical activity,
Plaintiff said she walked leaning on a cart at the grocery store,
she was able to stand for about ten to fifteen minutes, and she
slept with the aid of medication.  (R. 67-68.)

Regarding mental health, Plaintiff talked about her depression
causing guilt, crying, and lack of hygiene.  (R. 65.)  She also
said her anxiety caused her to get sweaty and fidgety around
people—-both family and the public--and she just needed to get away
from the situation.  (R. 66-67.)  Plaintiff explained that her
mania was associated with money and spending and excessive activity
as well as insomnia.  (R. 68-69.)

Because the ALJ had not had a chance to review recently
submitted records, he stopped the hearing and planned to have an
expedited supplemental hearing if necessary.  (R. 70.)

The supplemental hearing was held on August 19, 2016.  (R. 38-
51.)  Plaintiff testified that she had been a lot more depressed
since the February hearing and medication adjustments had been
made.  (R. 41-42.)  She said her nervous behaviors had been worse,
including picking at her face and peeling skin off her feet.  (R.
45.)

Plaintiff also described widespread pain symptoms and difficulty sitting in the car to get to the hearing because sitting caused pain in her low back which radiated up to her neck and could cause a migraine. (R. 44.) She said she had migraines daily for the preceding two weeks, each lasting several hours. (*Id.*)

ALJ Burock asked the vocational expert ("VE") if a hypothetical individual of Plaintiff's age, education, and work experience who had a residual functional capacity for light work with specified additional limitations could engage in Plaintiff's past work. The VE testified that the individual could not but would be able to perform other jobs that existed in significant numbers in the national economy. (R. 48-49.) When ALJ Burock limited the individual to sedentary work with the same limtiations, the VE identified suitable exemplary jobs. (R. 49-50.) For the third hypothetical, the ALJ added the restrictions that the individual would be able to sit for four hours, walk for one hour, and stand for one hour in an eight-hour day. (R. 50.) The VE testified that no jobs would be available for such an individual. (*Id.*)

## D.   *ALJ Decision*

In his March 29, 2017, decision, ALJ Burock found Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; lumbar radiculitis; cervical spndylosis with cervical radiculopathy; obesity; bipolar disorder; generalized

anxiety disorder; and type 2 diabetes mellitus with diabetic neuropathy. (R. 17.) He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment and she did not satisfy the "paragraph B" criteria of listing 12.04 or 12.06 in that she had at most moderate limitations in the identified categories. (R. 18-19.)

ALJ Burock then assessed that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work

> except she is limited to simple, routine, repetitive tasks with a GED of 1, 1, 1 and no public interaction. The claimant is limited to occasional (defined as up to 1/3 of the workday) interaction with coworkers and supervisors and occasional changes in the work setting. The claimant can frequently (defined as 1/3 to 2/3 of the workday) use the bilateral upper extremities and is limited to occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling. There should be no exposure to hazards, such as unprotected heights or dangerous equipment.

(R. 20.) With this RFC, the ALJ determined that Plaintiff was not able to perform her past relevant work. (R. 25.) He then found she was able to perform other jobs that existed in significant numbers in the national economy and therefore concluded Plaintiff had not been under a disability from November 24, 2012, through the date of the decision. (R. 25-26.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

13

determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. (R. 25-26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–– particularly certain types of evidence (e.g., that offered by treating physicians)––or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

16

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally,

an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in finding Plaintiff's mental health conditions do not meet Section 12.04 of the Listings; 2) the ALJ erred in failing to accord proper weight to Plaintiff's treating mental health providers in reaching an RFC assessment; and 3) the ALJ's residual functional capacity ("RFC") findings are not supported by substantial evidence. (Doc. 11 at 27-39.)

### A. Listing 12.04

Plaintiff alleges ALJ Burock erred in determining that her mental health condition did not meet the requirements of Listing 12.04, specifically pointing to error in the findings that Plaintiff had moderate limitations in interacting with others and in concentrating, persisting, and maintaining pace. (Doc. 11 at 27, 29-30.) Defendant responds that substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments did not meet the requirements of a listed impairment. (Doc. 14 at 26.) The Court concludes the claimed error is cause for remand.

A claimant bears the burden of establishing that his impairment meets or equals a listed impairment. *Poulos v. Comm'r*

18

*of Social Security*, 474 F.3d 88, 92 (3d Cir. 2007). Listing 12.04
(Affective Disorders) has A, B, and C criteria. Listing 12.04 is
met if both the A and B criteria are met or if the C criteria are
met. To meet the B criteria, a plaintiff must show that her
impairment results in an extreme limitation in one or marked
limitation in two of the following categories: 1) understanding,
remembering, or applying information; 2) interacting with others;
3) concentrating, persisting, and maintaining pace; or 4) adapting
or managing self. 20 C.F.R. pt. 404, subpt. P, App'x 1, at §
12.04(B). A "marked" restriction is one that is more than moderate
but less than extreme and that interferes "seriously" with an
ability to function independently, appropriately, effectively, and
on a sustained basis. *Id. at* § 12.00F2.

Regarding the finding of moderate limitations in her ability
to interact with others, Plaintiff generally avers that the ALJ's
determination was based in part on her ability to relate in a
clinical setting which "does not necessarily translate to an
ability to relate well in the outside world or function in a work
setting." (Doc. 11 at 29.) In further support of her assertion
that she has more serious limitations in this area, Plaintiff
counters the ALJ's conclusion that she spends time with others and
goes out in public by pointing to her testimony about difficulties
going out in public and being with family; psychiatrists' notes
about irritability, lashing out, emotional withdrawal, and

isolation; and treating psychiatrists' opinions on the matter. (*Id.*)

In assessing a mental impairment, the Third Circuit Court of Appeals recognizes a distinction between a claimant's behavior in the clinical or home setting and elsewhere.  For a claimant who has a mental impairment like "an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic."  *Morales*, 225 F.3d at 319.

*Morales* guidance indicates that ALJ Burock's reliance on Plaintiff's ability to "relate well in the clinical setting" and be cooperative and adequately conversant in that setting does not provide support for his determination at step three that Plaintiff has moderate limitations in interacting with others.  (R. 19.)  His statement that Plaintiff "spends time with others" (*id.*) does not support his assessment because the record shows  that her public and family interaction was limited and the time spent with others was primarily in a therapeutic setting or at home with her boyfriend and grandson.  (R. 45-46, 66, 69, 268, 271, 272-73.)  Pursuant to *Morales*, 225 F.3d at 319, behaviors found in these settings are distinct from those reported elsewhere.

Further, the ALJ's statement that Plaintiff "goes out in public" does not address *interaction* with others and does not portray the whole picture in that Plaintiff's testimony and Mr. Nieves' report indicate seriously increased anxiety around people,

particularly in a public setting. (R. 45, 66-67, 273, 275.) Given record evidence and the fact that ALJ Burock credited Plaintiff's and Mr. Nieves' reports of increased anxiety around strangers in his RFC assessment without specific limitation (see R. 23, 24), the Court finds no basis to conclude that he should not have credited the evidence in his step three determination. Similarly, his finding that there was "no evidence of . . . social withdrawal or antisocial behaviors" is not consistent with his later finding that reports of such behaviors by Plaintiff's boyfriend were "generally persuasive" and "largely consistent" with Plaintiff's reports of record. (R. 24.) Because the majority of the claimed bases for the finding of moderate limitations in interacting with others do not provide the support suggested, the Court cannot conclude the determination is based on substantial evidence.

This conclusion is bolstered by ALJ Burock's rejection of Dr. Gavazzi's finding that Plaintiff was moderately limited in her ability to interact appropriately with the general public and his conclusion that Plaintiff was limited to no public interaction. (R. 23.) ALJ Burock stated in his assessment of Dr. Gavazzi's opinion that Plaintiff had "greater limitation with respect to public interaction given her and her boyfriend's reports of increased anxiety around strangers. As such she is limited to no public interaction" (R. 23). Thus, ALJ Burock concluded that Plaintiff had more than a moderate limitation in her ability to

21

interact with the general public.  A limitation that is "more than moderate" and "less than extreme" is  a "marked limitation" pursuant to 20 C.F.R. pt. 404, subpt. P, App'x 1, at § 12.00F2. From this perspective, ALJ Burock essentially found in his RFC assessment that Plaintiff had at least a marked limitation in her ability to interact with the general public.  (R. 23.)  As interacting with the public is a component of interacting with others, the ALJ's finding at step three that Plaintiff had moderate limitations in her ability to interact with others requires further consideration on this basis as well as those previously identified.

Regarding the finding of moderate limitations in concentrating, persisting, or maintaining pace, Plaintiff criticizes the ALJ's finding that she generally showed appropriate attention and focus in the clinical setting.  (Doc. 11 at 30.)  In support of the claimed error, Plaintiff points to psychiatric treatment notes that repeatedly show she is distractible and has difficulty concentrating, testimony about her ability to focus, and treating psychiatrists' opinions that she had marked or extreme limitations in mainaining attention for two-hour segments and performing on a consistent basis.  (*Id.* (citing R. 70, 793, 811, 944, 1126, 1161, 1218, 1314, 1425).)

The Court finds ALJ Burock's reliance on clinical setting performance problematic for the reasons discussed above, i.e., the recognized discrepancy between abilities exhibited in the clinical

22

and home settings and performance elsewhere. *Morales*, 225 F.3d at 319. ALJ Burock's reliance on Plaintiff's ability to pay bills and watch television is problematic because there is no evidence that Plaintiff engages in these activities in a manner that exhibits concentration, persistence, or pace. His reliance on Plaintiff's ability to read is problematic because he does not discount Plaintiff's testimony that her reading at the time of the second hearing was mostly connected with Bible studies and she followed along with a phone app that read the Bible to help her focus. (R. 70.) While ALJ Burock may be correct that "[t]here is no evidence of significant deficits in attention, memory, insight, or judgment" (R. 19) and she "generally has intact thought processes" (*id.*), these clinical findings do not equate with findings regarding concentrating, persisting, or maintaining pace in that "concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." POMS DI 34132.011.[2] Based on the review of evidence relied upon by ALJ Burock and definitional considerations, the Court cannot conclude that his finding on the issue is based on substantial evidence.

Nor can the Court conclude that the error is harmless because ALJ Burock does not discuss evidence which may support a conclusion

[2] https://secure.ssa.gov/poms.nsf/lnx/0434143011.

23

that Plaintiff has more significant problems in these areas.  This evidence includes Dr. Mania's office notes which indicate concentration and distractibility problems (R. 944, 1126, 1161, 1425), Dr. Garg's similar reports (R. 1218, 1314), and Mr. Nieves' reports that Plaintiff has trouble completing tasks, trouble remembering to do things, and trouble concentrating and staying focused.  (R. 273.)  In the context of his RFC assessment, ALJ Burock noted that Plaintiff had these problems and, as noted above, found Mr. Nieves' report "generally persuasive" (R. 24), but ALJ Burock does not indicate in his step three analysis how he factored Mr. Nieves' specific statements about relevant issues into his determination that Plaintiff had moderate limitations in concentrating, persisting, or maintaining pace (*see* R. 19).

Because the Court cannot conclude that evidence relied upon by the ALJ constitutes substantial evidence in two functional categories and because the ALJ did not address significant evidence in his discussion of these functional categories, this matter must be remanded for further consideration.

**B.    *Mental Health Opinions***

Plaintiff asserts the ALJ did not accord proper weight to the opinions of Dr. Mania and Dr. Garg, her treating mental health providers.  (Doc. 11 at 31.)  Defendant responds that substantial evidence supports the ALJ's assessment of the opinions.  (Doc. 14 at 31.)  For the reasons discussed below, the Court concludes that

further explanation of the weight assigned the opinions is warranted.

ALJ Burock assigned little weight to the opinions of Dr. Mania and Dr. Garg primarily because he found them inconsistent with psychiatric treatment records showing largely normal psychiatric examinations and the conservative level of mental health treatment Plaintiff had received. (R. 23.) He also found Dr. Garg's opinion inconsistent with "the persuasive opinion of Dr. Gavazzi," the State agency non-examining consultant. (*Id.*)

*Morales* specifically directs that a treating mental health provider's "opinion that [the claimant's] ability is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting." 225 F.3d at 319. *Morales* also explains that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving mental disability." *Id.*

Furthermore, in the case of mental health impairments, courts have recognized that a medical source's opinion which relies on subjective complaints should not necessarily be undermined because psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of a patient's subjective complaints. *Schickel v. Colvin*, No. 14 C 5763, 2015 WL 8481964, at

*11 (N.D. Ill. Dec. 10, 2015); *Hall v. Astrue*, 882 F. Supp. 2d 732, 740 (D. Del. 2012). The importance of recognizing difficulties in ascertaining the severity of a mental health impairment was discussed in *Frye v. Berryhill*, Civ. A. No. 3:16-CV-1482, 2017 WL 4387060 (M.D. Pa. Oct. 3, 2017).

> Mental impairments such as depression and anxiety . . . may manifest in symptoms difficult to quantify through objective medical evidence. A lack of objective medical evidence is by itself insufficient to discredit [a] claimant. SSR 96-7p. As noted by other courts in the Third Circuit, impairments such as depression and anxiety "while medically determinable, are difficult to substantiate by objective medical evidence." *Volage v. Astrue*, No. 11-CV-4413, 2012 WL 4742373, at *7 (D.N.J. Oct. 1, 2012). "[T]he reports of treating physicians, as well as testimony by the claimant, become even more important in the calculus for making a disability determination" in circumstances involving impairments for which objective medical testing may not demonstrate the existence or severity of an impairment. *See Perl v. Barnhart*, No. 03-4580, 2005 WL 579879, at *3 (E.D. Pa. March 10, 2005) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2002)). Thus, credibility becomes paramount in making the disability determination without objective medical evidence to refute the findings of a treating source.

*Frye*, 2017 WL 4387060, at *4.

Similarly, reliance on "conservative treatment" to discount an opinion or credibility takes on special significance in the mental health context. Lack of evidence of inpatient hospitalizations or emergency room visits does not render treatment conservative where the record shows a claimant took medication to control her mental

26

health conditions for years and she consistently sought treatment from mental health professionals during the relevant time period. *See Thomas v. Colvin*, Civ. A. No. 15-876, 2016 WL 4537065, at *3 (W.D. Pa. Aug. 30, 2016).

Finally, the importance of subjective complaints related to mental impairments and difficulty quantifying these impairments through objective medical evidence indicates that non-examining source opinions should be carefully considered when an ALJ relies on such an opinion to discount a treating source opinion. Important considerations are the degree to which the non-examining source provides supporting explanations for the opinion and the degree to which the source considers all pertinent evidence, including opinions of treating and examining sources. 20 C.F.R. § 404.1527(c)(3); *see also Blum v. Berryhill*, Civ. A. No. 3:16-CV-2281, 2017 WL 2463170, at *7-9 (M.D. Pa. June 7, 2017).

The Court cannot categorically reject ALJ Burock's assessment that Dr. Mania's and Dr. Garg's findings that Plaintiff has marked or extreme limitations which would render her unable to work are not supported by treatment records showing largely normal psychiatric exams (R. 23). However, the ALJ's focus on clinical setting psychiatric examination findings is questionable under *Morales*, particularly because the ALJ's analyses do not generally consider the importance of subjective complaints or the difficulty in quantifying mental impairments through objective evidence and

27

because the analyses do not specifically consider Plaintiff's subjective reporting to her providers or the consistency of her reports to them with her testimony and Mr. Nieves' reports. *Morales*, 225 F.3d at 319; *Hall*, 882 F. Supp. 2d at 740; *Frye*, 2017 WL 4387060, at *4.

The Court does not accept the ALJ's finding that the opinions were inconsistent with the conservative level of mental health treatment Plaintiff received because "she has not required a higher level of case, such as hospitalization" (R. 23). Rather, consistent with *Thomas*, the Court will not conclude that mental health treatment has been "conservative" when a claimant has not required inpatient hospitalization. 2016 WL 4537065, at *3. Throughout the relevant time period Plaintiff was regularly seen by treating psychiatrists and she also went to group and individual therapy. (*See* Doc. 11 at 16-21.) Plaintiff was on numerous medications for her mental health conditions (*see id.*), and the need for medication management due to varying effectiveness is supported by the record (*see*, *e.g.*, R. 41-42, 66). Because the Court does not find a basis to deem this level of treatment conservative, the ALJ's labeling it so cannot be considered supportive of his determination that the opinions were entitled to limited weight (R. 23).

Assignment of great weight to Dr. Gavazzi's opinion and discounting Dr. Garg's opinion on the basis of being inconsistent

28

with Dr. Gavazzi's opinion is not persuasive pursuant to 20 C.F.R. § 404.1527(c)(3). Dr. Gavazzi provides limited explanations for his findings in his non-examining opinion, the opinion does not consider all pertinent evidence, and the opinion references only one finding from an examining source and states there are no treating source opinions in the record related to mental impairments. (R. 112-14.) Dr. Gavazzi's limited explanations are more in the nature of conclusory statements and do not refer to specific evidence of record. (*Id.*) He assigned "great weight" to Dr. Mania's GAF of 65 but did not review other mental health records or the treating psychiatrist's opinions. (R. 114.) Dr. Gavazzi's opinion was rendered in April 2014 and he did not review pertinent evidence arguably indicative of worsening mental health problems and/or more limited functioning than he assessed. (*See*, *e.g.*, R. 41, 65-66; R. 268-75.) The breadth of Plaintiff's treatment during the relevant time period is not reflected in Dr. Gavazzi's RFC assessment as demonstrated by his statement that Plaintiff did not participate in psychotherapy (R. 114) where the record shows that Plaintiff began to do so and attended regularly beginning in April 2014 (Doc. 11 at 18; R. 43).

For all of these reasons the Court cannot conclude that ALJ Burock's opinion assessments are supported by substantial evidence. Therefore, further consideration of the mental health opinions of record is required on remand.

## C. Residual Functional Capacity Assessment

Plaintiff contends the ALJ's RFC findings are not supported by substantial weight from either a physical or mental standpoint. (R. 35.) Defendant responds that substantial evidence supports the ALJ's RFC assessment. (Doc. 14 at 37.) Because remand is required for further consideration of the ALJ's step three findings and further consideration of mental health opinion evidence in the RFC context, the Court will focus on RFC findings regarding physical abilities. From this perspective, the Court concludes that certain aspects of the RFC assessment are not supported by substantial evidence and must be addressed on remand.

Specifically, ALJ Burock concluded Plaintiff was capable of performing sedentary work physically limited to frequent use of the bilateral upper extremities; occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; and no exposure to hazards such as unprotected heights or dangerous equipment. (R. 20.) He found that medical records corroborated Plaintiff's allegations of chronic neck and back pain with radiation secondary to cervical spondylosis with cervical radiculopathy, degenerative disc disease of the lumbar spine and lumbar radiculitis. (R. 21 (citations omitted).) ALJ Burock found that the medical record, including Plaintiff's clinical presentation, did not establish evidence of severe pain or fatigue such that she could not perform the requirements of sedentary work.

(R. 22.)  He also found that the evidence supported Plaintiff's
allegations that her pain interferes with her ability to perform
activities of daily living.  (R. 22 (citing Ex. B31F/1, 6 [R. 1655,
1660]).)  ALJ Burock attributed partial weight to the opinion of
Angelique High who found in October 2012 that Plaintiff was within
the sedentary labor physical demand level.  (R. 24.)  He stated
that the opinion was rendered by an examining source who performed
thorough testing of Plaintiff's abilities.  (*Id.*)  As noted
previously, ALJ Burock found the Function Report of Plaintiff's
boyfriend, William Nieves, "generally persuasive, as it is based on
personal observation of the claimant and is largely consistent with
the reports made by the claimant in the record."  (*Id.*)  ALJ
Burock's specific references to the report included Mr. Nieves'
indication that Plaintiff had particular difficulty with prolonged
standing and sitting.  (*Id.*)

Taken together, a tension exists between ALJ Burock's finding
that Plaintiff can perform sedentary work and his crediting records
which indicate she would or could have difficulty sitting for the
amount of time contemplated at the sedentary level.  Most notably,
Ms. High determined that Plaintiff was limited to occasional
sitting, defined as 6-33% of the time.  (R. 1085.)  This limitation
is consistent with Plaintiff's testimony relating exacerbation of
back pain and increased radiating pain to sitting (R. 44, 61) and
Mr. Nieves' statement that Plaintiff could not sit for long periods

because of back pain (268, 273).  While ALJ Burock did not
specifically credit Plaintiff's sitting limitation in his RFC
assessment explanation, he arguably did so inferentially by
attributing partial weight to Ms. High's opinion and acknowledging
that it was based on thorough testing of Plaintiff's abilities,[3] by
finding that medical records corroborated Plaintiff's allegations
of chronic neck and back pain with radiating symptoms, by finding
Mr. Nieves' report that Plaintiff had particular difficulty with
prolonged sitting generally persuasive, and by finding the report
persuasive because it was based on personal observation and
consistency with Plaintiff's reports.  (R. 21, 22, 24.)

     These findings are relevant to the assessment of Plaintiff's
ability to do sedentary jobs which are jobs performed primarily in
a seated position.  20 C.F.R. §§ 404.1567; SSR 83-10, 1983 WL
31251, at *5.  SSR 96-9P addresses a claimant's ability to do less
than a full range of sedentary work.  SSR 96-9P, 1996 WL 374185

---

     [3]  The Court recognizes that an ALJ is not required to
incorporate every finding made by a medical source into his RFC
assessment even where he has given the source's opinion significant
weight.  *See, e.g., Wilkinson v. Comm'r of Soc. Sec.*, 558 F. App'x
254, 265 (3d Cir. 2014).  ALJ Burock did not discount any specific
finding in Ms. High's opinion in connection with his decision that
it was entitled to partial weight.  (R. 24.)  Limitations
identified based on "thorough testing of the claimant's abilities"
(R. 24) such as Plaintiff's limitation to sitting up to one-third
of the workday (R. 1085) certainly constitute probative evidence
which could only properly be rejected with an explanation by ALJ
Burock for doing so.  *Cotter*, 642 F.2d at 706-07 ("[A]n explanation
from the ALJ of the reason why probative evidence has been rejected
is required so that a reviewing court can determine whether the
reasons for rejection were improper.")

(1996). The ruling explains that an individual must be able to remain in a seated position for approximately six hours of an eight-hour workday in order to perform a full range of sedentary work. *Id.* at *6. "If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded. The extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work." *Id.* SSR 96-9P indicates that the occupational base will be eroded where the need to change positions cannot be accommodated by scheduled breaks and a lunch period. *Id.* at *7. The extent of the erosion depends on the facts in the case record and the RFC must be specific as to the frequency of the individual's need to change positions. *Id.*

Given the evidence credited by ALJ Burock and sedentary level sitting considerations set out in Social Security regulations and rulings, he arguably inferentially accepted Plaintiff's inability to sit for the period required to perform a full range of sedentary work but he did not acknowledge the limitation in his RFC or discuss the relevant erosion of the occupational base. (*See* R. 20-24, 25-26.) Nor did ALJ Burock explain how the evidence accepted did not equate with a finding that Plaintiff was unable to meet the sitting requirement contemplated at the sedentary work level. Therefore, the Court cannot conclude that substantial evidence supports ALJ Burock's RFC assessment that Plaintiff was capable of

performing sedentary work without consideration of the duration of time she was capable of sitting.

Further, the Court cannot deem the error harmless. For the third hypothetical presented to the VE at the August 2016 hearing, ALJ Burock added the restrictions that the individual would be able to sit for four hours, walk for one hour, and stand for one hour in an eight-hour day. (R. 50.) The VE testified that no jobs would be available for such an individual. (*Id.*) No hypothetical to the VE included specific consideration of the ability to sit for less than six hours in an eight-hour workday, the need to alternate positions, or the limitation to occasional sitting found by Ms. High. (*See* R. 47-51.) Thus, the ALJ's step five conclusion based on VE testimony that Plaintiff could perform jobs that existed in significant numbers in the national economy (R. 25-26) would not be supported by substantial evidence if the sitting limitation were credited. *Rutherford*, 399 F.3d at 554.

## V. Conclusion

For the reasons discussed above, the Court concludes this matter must be remanded to the Acting Commissioner for further consideration. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATE: July 24, 2018

34